May it please the Court, my name is Margaret Marconi. I'm here on behalf of Tremaine Burt, appellant. And I'd like to ask to reserve two minutes rebuttal time. May I just ask you a question, because I'm not sure I at least have a complete record. Yes, Your Honor. At the habeas hearings, are there any affidavits on either side with respect to the question of calling these additional two witnesses? Were there any affidavits? Yes, from either Mr. Burt or from the State, or from counsel for Mr. Burt, about what happened? Yes, there were affidavits submitted, but at the time of the evidentiary hearing, we also produced the witnesses, so they also testified to the contents of the declaration. They testified at the habeas hearing as to what they would have said had they been called? Well, we what we did is we conducted, it was sort of a bifurcated proceeding. We did the deficiency prompt first, and then we did the depositions of the witnesses, Nicole Hidalgo and Edward Lee. So they did testify, yes, Your Honor. Did the sufficiency, what do you mean by that? I'm sorry? Did the sufficiency part first? The deficiency prompt first. Oh, deficiency prompt first, yes. And then you did apprentice. Yes, then we, then we. And what did the two witnesses say that they would have testified to? Well, Edward Lee said that he would have testified in corroboration of. Oh, I'm sorry. I know. Yes, I recall. Sorry, that's my mistake. Okay. I do remember recalling this. We have another case. Yes. It gets confusing. Okay. One conceptual question at the outset, and it's sort of discussed in a little debris, is what we do under AEDPA when you have an extensive evidentiary record and separate fact findings on that record, which were not available in the state court. Do we then defer to the state fact finding in any way? Do we just start over again? I think we have argued that the standard would be de novo in that regard, but. It's not de novo because we would have to defer to the district court's fact findings. But we wouldn't have to defer to the state court's conclusions, right? Well, I think in any event, the court could look at what the state court said and find that it was objectively unreasonable, an objectively unreasonable application of Strickland. I think that the court still has to look at whether that rendering, that opinion, was objectively unreasonable. And we think it was. Given the facts of Riley and how this Court interpreted the application of the AEDPA there, we believe that it's very similar. In other words, that the state court misapprehended the critical nature of the corroboration testimony, making it an unreasonable application of Strickland. All right. But we do have the decision by the district court here, which we do review for clear error as to the facts, right? Yes. But with the Strickland case, it's a mixed question. So the magistrate judge determined and the district court approved a determination that there's no reasonable probability that the outcome would have been different had the Lee and Hidalgo testified at trial. Is that right? Yes. That's what the magistrate judge did, but the court didn't. And why was that determination wrong? Well, the magistrate judge failed to even apply the Riley v. Payne, which is a case that this Court – where this Court found ineffective assistance of counsel when the lawyer failed to present a corroborating witness. Well, is a lawyer supposed to present a witness whose story's changed many times? I mean, the magistrate judge found that they could have easily been impeached. Their credibility was at issue, and their prior statements, some of them were inculpatory, actually. Well, Your Honor, under Riley v. Payne, this analysis – this Court has analyzed that, that even where there could be some damaging information or some prior inconsistent statements, that even in that case, that the corroborating evidence could still be – could still be brought in any case. Isn't that very deficient performance rather than prejudice? I'm sorry, Your Honor? Doesn't that go to deficient performance rather than prejudice? Well, it goes to both, really. Well, the prejudice question is one that the Court's ruled on, basically, didn't it? Yes. They skipped the deficiency problem. And I said, if these people testified, it wouldn't really change – it wouldn't undermine their confidence in the result, that there was no probability that the jury would have a different result or that even one juror would. That if they heard all of the testimony from Lee and his mother, that it – the result would still be the same, that that was under the Strickland test. Why – why is that wrong? Well, Your Honor, under Riley v. Payne, basically what happened here is the magistrate judge didn't apply Riley v. Payne or Luna v. Camber or any of the – Well, whatever – whatever the cases you've heard, why would it be wrong? You – you – just forget the cases and go to the conclusion. Why is the conclusion wrong that the testimony of those two witnesses would not have undermined confidence in the result? One witness really didn't see anything. Well, Your Honor, Edward Lee saw – That's the other one. The other witness says he saw a gun. Yes. Not in the room, but outside earlier. He also says he saw the defendant pull a gun, shoot someone, threaten the other man, and ask him for money. That would have been his testimony. Well, actually, when Edward Lee testified in his deposition, he said that he didn't see that. All right. But he would be cross-examined with the other witness. He would be cross-examined on it. But – but he would be saying it would just be impeachment. And certainly testimony that would corroborate the theory of self-defense here was much more – But it corroborated – it did corroborate it some. And earlier there was nothing corroborating it. Yes. But it corroborated it in a fairly attenuated fashion. I mean, it didn't – Right. Well, they didn't – Even on that, he didn't tell the police that story. That was a story that he told later. But when he was questioned by the police about what happened, he didn't tell that story. No, he didn't tell that story, and he testified that he was never asked. Are we encroaching upon an attorney's discretion on how to try the case if we say that he's obligated to call a witness who gave several different versions, including one that inculpates the defendant? I mean, don't we have some discretion here? Well, Your Honor, it – the district court looked at the prejudice prong. And in this case, Edward Lee would have testified – he would have been impeached on a prior inconsistent statement that he said to the police about the attempted robbery. But not even where – but also where he was. I mean, his statements, earlier statements, conflicted in several respects, did they not? Right. They did. But he clears it up in his deposition testimony where he says that he heard a shot and then he went to look. So – but in this case, the attempted robbery, it carried a maximum sentence of three years. And the jury acquitted Mr. Burt on that charge. So looking back, we can see that the jury didn't believe the prosecution witnesses on the attempted robbery in any way. They had another guy who was now saying that – who could be cross-examined, at least, with an early statement that there was such a robbery. And Mr. Burt's testimony went uncorroborated here. It was his word against two gang-affiliated members who were associated with the victim. And he had – It would help me to understand, because the record was a little murky, about exactly – Mr. Lee – I mean, did he see – claim to see the gun in the victim's waist – Yes, he did. I know he did. Just admit it. I'm sorry. And at – I mean, how long before this whole event was this? It was very hard to tell that. Okay. Yeah, he – before everyone, including my client, went over to Nesodaga's apartment, these were complexes right one – Right, and they were all sitting in this carport. Yeah. Is that when he said he saw it? That's when he saw it. At some points, he seems to say that. But at other points, he seems to say he saw it at somewhere else. No. There's nothing in the record that would indicate that he saw – that he saw the gun at some other time. Duane Dade, the lawyer, says that he thought that Edward Lee had seen it at some other time, but that wasn't true. And Mr. Dade never interviewed Edward Lee personally. So there was essentially a – I mean, he saw him with this gun on his body at a time when he just went straight from there to this apartment. That's right. And Edward Lee testified at his deposition that it took about five minutes for him to walk over to his mother's apartment, and everybody else went at the same time. So earlier in the day is sort of underselling it. Yes, it is. It's really – it's part of the same set of events. That's right. And in Riley v. Payne, the victim in that case, it was also a self-defense case, and the corroborating witness had run away before the shooting, hadn't seen the shooting, but had heard – had heard the victim say, I'll shoot you. So even though it's attenuated, even though it's not precise and it doesn't directly contradict the eyewitness accounts, it was found – this Court found that that was prejudicial, ineffective assistance of counsel for failing to call that witness. It's very similar to Riley v. Payne. It's sort of like what he was wearing at the time. It was the same time. Right. And there's – as we said in our briefing, there's no testimony that the victim stopped anywhere or did anything. He went directly to the apartment. And this – and Mr. Burt's testimony left uncorroborated. It was just a fair testimony without much of an effective defense, as this Court said in Luna v. Canberra. What about Ms. Hidalgo? What was she supposed to be testifying to? Well, she would have testified – Oh, that this guy – they were generally gang members and had guns. Yes. Yes, that's right. And that he had threatened to shoot some people. And actually, she had heard – she had heard the victim say to his landlord in the carport – actually, not to his landlord, but about his landlord while they were in the carport area, I want – we better leave before I bust a cap in this guy. And that indicates that he could have been armed and also that Mr. Burt could have heard that as well. So she would have also testified to – both Mr. Lee and Ms. Hidalgo would have testified to what the prosecutor referred to as the missing gun and what happened to the victim's gun. They could have testified to the chaos that ensued after the shooting and that many people were coming and going and – Okay. Back to my earlier question. Yes. Yes, Your Honor. And the declaration in 2001, apparently Lee did say that he saw it at the – in the carport. He said that while visiting some people at Timothy Jackson's apartment, he saw it. Yes, Your Honor. So he didn't say – so he was inconsistent about that, too, about when he saw it. He was – Inconsistent about when he saw it. No, he – I'm sorry, Your Honor, what's the sentence? My understanding is that in his original declaration in November of 2001, he said that he saw it when he was visiting some people at Timothy Jackson's apartment. That's when he saw the gun in Mr. Jackson's waistband. He said – and I can get – I can get the report, Your Honor. I'm trying to figure out whether he was consistent even about that. Yes. Oh, yes. He was consistent about that. He said – I don't recall anywhere where he would have said that it was – he saw it in the carport area, that he was over there visiting some friends. But he saw it during this whole interaction in the carport area. Not in Mr. Jackson's apartment? I'm sorry. I'm reading from the – from the magistrate justice report. He says that in the declaration in 2001 that what he said was that he saw it while visiting some people at Timothy Jackson's apartment. Is that the same case? Oh, no. Oh, the magistrate judge said that. Yes. Oh, okay. No. No, he's – he was – he was over in the carport area visiting people. This was all during the carport area. So that's when he was visiting people in – actually, not in the apartment, but near the apartment? He was – right. He was in the carport area, and he saw – when Mr. Jackson lifted up his shirt to scratch his belly, he saw the gun in his waistband. But that's what he said at the time of the declaration, not only at the evidentiary hearing. That's what I'm talking about. He said it at both places, and he said it to the defense investigator as well. It's always been consistent. And the troubling part about what the district court did here is that it never addresses Riley v. Payne, which is the controlling case here. The district court just distinguished it and quickly disposed of it in one sentence saying that Riley was an alibi case, which it wasn't, and saying that there was no contrary statements to the police. And that's also – that's also inaccurate. This Court mentioned on four different occasions in that opinion that the corroborating witness would have had credibility problems. And even yet, even still, that that witness was very important to corroborating an aspect of Mr. Riley's testimony. One question is, did the witnesses who testified at trial say that Mr. Jackson didn't have a gun, or that – or they just didn't say he did have a gun? They said – they said they didn't see a gun. They didn't see a pulled gun, but did they say he didn't have a gun, or they didn't know, or was it – were they asked that? They were asked if they saw a gun, that they saw whether or not he had a gun, and they – they said that. He had a gun or he used a gun? Had a gun. Had a gun. Yes. So this – this would have been the corroboration. It was – you know, it was a credibility contest between Mr. Burt and Mr. Jones and Mr. Whitehurst, who were affiliated with the victim, who were gang members. And – and this – this testimony would have corroborated an aspect of Mr. Burt's testimony. It's very important. In fact, Justice Mosk dissented in the State court opinion saying that – that this really could have corroborated an aspect of his testimony, and it was very important that – that it should have been heard. And I think – I don't think Riley v. Payne was out when Justice Mosk wrote that, but he – he was – he was prescient in saying that. Let me just ask you one thing about the California Court of Appeal proceeding. The court said they weren't going to issue an order to show cause. Yes, Your Honor. The habeas cases I've seen in the California Court of Appeal, they were viewing a habeas hearing in the district court, and they just hear it the way you hear an appeal. In this case, they – they didn't – they didn't issue an order to show cause, which means what? That they didn't hear the appeal, or? No, they heard the appeal, and then the habeas was filed separately, and they – and So I don't – I mean, was there a habeas hearing in the trial court? No, Your Honor. There was straight to the court of appeal for the habeas hearing? Yes, but there wasn't a habeas hearing in the – in the court of appeals. They just said – Well, there normally isn't. They don't have an evidentiary hearing. Right. Right. They would – they would remand it to the superior court if they had a hearing. Could you go back once more to my concern about whether Mr. Lee was consistent even as to this issue? Now, I do have the declaration of Edward Lee from November of 01. And he said, We drove to a complex west of our apartment to visit some people at Timothy Jackson's apartment. While we were there, I saw Mr. Jackson arrive with James Jones and walk up the steps to his apartment. I saw a black-colored handgun tucked into the waistband of Mr. Jackson's pants. Now, isn't that somewhat different than what he later said? No. They were visiting people in the carport area outside. But he said he saw him walking up to his apartment. He didn't say he was in the carport area. Right. But this was all happening at the same time and immediately after they left to go over to Ms. Hidaga's apartment. It just seems to be a somewhat different story, is my point. Well, the bottom line is there's a witness who saw the victim with a gun. This was a self-defense case. And Riley v. Payne has never been appropriately applied here, and it's never really been applied at all. The facts were completely misapprehended on that case by the district court. And, you know, in the end, it was really a credibility contest between Mr. Byrd, who had no prior felony convictions, versus James Jones, who had three prior felony convictions, and one of them was for terrorist threats. There was an allegation that James Jones had threatened Nicole Hidalgo to kill her after the shooting. And this was really the prosecutor's burden of proof. The jury deliberated over the course of three days, and it found it acquitted Mr. Byrd of the attempted robbery. So it was having real problems with the prosecution's case. And in the Riley decision, this Court said this was a cast of characters and witnesses of such a nature that corroboration most certainly would have been of critical value to the jury, even from an associate who originally told a different story to the police. Let me ask you something. If we were to think that the prejudice determination was wrong, would we send it back to the district court to do the deficiency, or would we do it ourselves, or what? No, Your Honor, I think the record has been adequately developed. But we're not fact-finders. Right. But I think the prejudice prong is sort of the flip side of the same coin for deficient performance in this case. Well, one big issue on the deficient performance was whether these people would have showed up and whether there was a ñ and whether, in fact, there was some obligation to provide them. I mean, they were quite reasonably apparently afraid to come back. And the question is, if they wouldn't have come back, was there an obligation to get them back and so on? It's all rather complicated, really. Right. It's never been disputed that Mr. Dade had subpoena power of out-of-state witnesses. What he testified to ñ Yeah, but they said they wouldn't have come, subpoenaed or not subpoenaed. Well, under California penal code section 1334, that outlines a whole procedure for getting witnesses to California from another State, and one of the procedures says that they can be taken into custody. So he had ñ it wasn't his own ñ That usually doesn't make a very good witness. Well, maybe, but the story would have been the same. I mean, the story would have still been that Mr. Lee saw the victim with a gun shortly ñ a black gun in his waistband shortly before the shooting. How old was Mr. Lee at this time? Mr. Lee was 13, and all of the other prosecution witnesses except for James Jones were also minors, Your Honor. He was interviewed by the police at least twice? I'm sorry. He was interviewed by the police at least twice? Mr. Lee? Yes. And the first time he said he didn't see anything ñ all the witnesses said they didn't see anything. So they all had similar ñ When did he first say he saw the victim with a gun? When the defense investigator interviewed him. The police never asked him if he saw ñ never asked him any questions about what occurred at the carport. Well, it wasn't his first story that it wasn't even anywhere in the area of the shooting. I mean, at the time the shooting occurred. He said he was in the hallway, and in his deposition he said he heard the shot and came out and looked. And so being a child, he believed, you know, that he was a witness to this shooting, and he witnessed some of the aftermath of it. Where is Mr. Lee's testimony in the excerpts? Do you know that? The evidentiary. On the evidentiary. It is in volume two, Your Honor, starting at page 158. 158.  Thanks. I mean, his story is different, in fact, at that point than it was earlier as to where he saw T.J. with the gun. Which is really a problem. He told the investigator, and he said in his 2001 declaration that he saw him walking up the stairs with the gun, and he testified that he ñ that they were in this carport area, and T.J. came up to Burt, and while he was there in the area, not walking up the stairs, and that's where he saw the gun. Now, how is anybody supposed to believe that story when it's not two stories? Well, I don't think it's ñ I don't think it's that contradictory, Your Honor. He saw ñ Well, what do you mean? One of them is he's walking ñ he sees him in the distance walking up the stairs, and the other one is he comes over to where they are and talks to them. Right. But, you know, this was ñ this all happened at the same time, and Mr. Lee was a child and recalls it, you know, now years later as he recalls it. But the fact remains that he saw a gun. He was the only ñ he was the only witness who saw the gun. But that's not the question. The question is that anybody could have believed that he saw a gun, given the fact that all these other different stories, and now we have even different stories to how ñ whether he saw ñ how he saw the gun. Well, Your Honor, I think ñ I think given the balance of what we had here, the cast of characters that were testifying on behalf of the prosecution, that they didn't believe that some of these prosecution witnesses on the attempted robbery, three of them testified to that at the trial, and the jury didn't believe them at all. So there wasn't ñ it certainly would have been more helpful to have a witness saying that he saw the victim with a gun in his waistband shortly before the shooting, as opposed to nothing at all. And, Your Honor, as I said before, this was really the prosecution's burden of proof here. And it's reasonably probable that had the jury heard this testimony by Edward Lee and Nicole Hidalgo, that they ñ they would have ñ it would have raised real questions. about the intentional homicide charge here, just as they had found a reasonable doubt with respect to the ñ with respect to the attempted robbery. And now, Nicole Hidalgo. All right. I think we are ñ we're way over time. Okay. So we'll give you a brief period for rebuttal. Thank you. All right. Good morning, Your Honors. May it please the Court, Deputy Attorney General Herb Tedeff on behalf of Respondent. Counsel in this case was not ineffective for failing to call the witnesses Lee and Hidalgo. Well, wait a minute. No one's ever decided that. The district court hasn't decided that question, whether it was ineffective. Well, when I say ineffective, I am including the prejudice prong as well. I'm using its generic sense of ineffectiveness. And the reason ñ He actually sounded pretty ineffective to me. He didn't know how to subpoena an out-of-state witness. And it seems to be the largest reason he didn't do it. Well, I agree. That was a problem. However, and ñ but if ñ but he also made some very valid statements as to why he wouldn't have wanted to call these witnesses. Well, if you're looking for inconsistent statements, that's a good place to start, was counsel's statements. Counsel's statements about his performance? Yeah. I would agree. And I believe that that's why the district court ñ Why they went to prejudice. Why he went to prejudice. Although I would point out that the district commented, after he analyzed all the prejudice and the prejudice prong, that he stated that it appeared that counsel did not engage in deficient performance, given the damaging statements that could have come out. But, at any rate, you would agree that if we thought that he was wrong in the prejudice prong, we would remand because there would be fact findings involved. Would you agree? On the prejudice prong? If we disagreed with the district court on the prejudice prong, we would remand on the deficiency prong. I believe that would be right, Your Honor, and he would have to make findings. But given the record in this case, I believe that it's clear that the district court was proper in determining there was no prejudice for several reasons. For one, each of the statements ñ each of these witnesses made statements that would have been very damaging to the defense. Each of the witnesses also made ñ So did everybody who actually did testify at trial, right? What's that? So did everybody who did testify at trial. All these people were switching stories all the time. Well, as far as making damaging statements, there were no other defense witnesses that I would call ñ I'm talking about the prosecution witnesses. The prosecution witnesses, some had made ñ that's true. There were some inconsistencies. But I don't think that that ñ the fact that the prosecution witnesses, some of them had inconsistent testimony, I don't think that that would have negated the effect that the damaging statements from these witnesses would have had. Specifically, as to Edward Lee, he stated that he saw the petitioner try to rob James Jones immediately after the shooting, which was consistent with what several prosecution witnesses had said. And that statement was completely inconsistent with the petitioner's defense, which is, I shot in self-defense and then I immediately fled. So I believe that had Edward Lee testified that he witnessed the petitioner try to rob James Jones, that would have been extremely damaging to the defense. And I might add that at the evidentiary hearing in this case, the petitioner was asked about that and the petitioner agreed that that statement would be very damaging to his defense. Likewise, as far as Nicole Hidalgo, she said that she was in the bathroom, she told the police that she was in the bathroom at the time of the shooting, that she heard the family, the victim questioned what he said, and then petitioner said he would show him and then she heard a gunshot. And that statement would also be very damaging to the defense. And again, petitioner at the evidentiary hearing testified and agreed that that statement would be damaging to the defense. So when we look at prejudice, we have to balance the potentially beneficial aspects of these witnesses' testimony against the damaging aspects. What's more, while some of the witnesses no doubt made inconsistent statements, there were some very glaring inconsistent statements made by the witness, by Edward Lee and Nicole Hidalgo. As far as Nicole Hidalgo, for example, she repeatedly told the defense investigator that she heard that the victim had carried a gun and in one statement said she heard,  yet in her deposition testimony, she then testified that she had personally seen the victim carrying a gun. And when she was confronted with her declaration, which stated that she had only heard that the victim carried a gun, she stated that that was wrong, that she had told the attorney preparing the declaration that it was wrong, and that even though she signed it, the attorney agreed he would change and fix it. And I think that's doesn't have real credibility to that statement, that that was like a lie. It's kind of strange because what happened at the deposition happened long after the trial, and we don't know what they would have said at the trial is the problem. In other words, when you're dealing with the prior inconsistent statements, the ones that were made to the police, we know they could have been impeached with them. But these things that were said much later, like this thing that I was talking about, about how Lee had two different versions of when he saw the gun, how would that affect the trial exactly? Well, you know, we are sort of extrapolating from a much later time as to what they would have said. And we don't know, for example, with regard to Mr. Lee, whether he would have told story number one or story number two, and we don't know whether the prosecution would have known of the other story and been able to use it, right? And I think that all goes to why Petitioner cannot meet the burden of proving prejudice, because we have lots of inconsistent statements and stories. We don't know exactly what would have happened, but we do know that there was certainly some grounds for impeachment at the time of trial, given what we have. Well, at the time of trial, aside from what Judge Berzon has pointed out about where he saw the gun, is there anything inconsistent in his statements up to then about having seen the gun? About seeing the gun? No, he first made the statement about seeing the gun to the defense investigator. So up until that point, having made no statements about it, there were no inconsistencies. Did anyone ever ask him about it before then? Well, he was interviewed by the detectives, and no one had ever mentioned seeing the victim with a gun, so the detectives, of course, had no basis to ask. So he wasn't asked about it until he was asked by the defense investigator. I believe he simply volunteered it. Again, I don't think the defense investigator had a basis to believe the victim had a gun. So when he was interviewed by the defense investigator, he said that he had seen a gun shortly before around the parking lot, whether on the stairs, down in the parking lot, whatever, that was the only statement he had made. And where was the inconsistency, as Judge Berzan has pointed out? When did that occur? Well, the inconsistencies as far as where he was, he made statements during the deposition. That was afterwards? That was afterwards, at the deposition. So as far as counsel was concerned, all he had done was say that he had seen the gun shortly before the incident. That's correct. Okay. And then if that were all that we knew about Mr. Lee, there would be absolutely no reason not to call him, right? Well, I believe there is an additional reason that counsel sort of implied in an answer at the evidentiary hearing, which was that counsel said he didn't believe Edward Lee's statement about seeing the gun, given his conversations with Petitioner. And while he didn't explain specifically what he meant, at trial Petitioner testified that he went to the victim's apartment with his cousin Nicole Hidalgo, only his cousin Nicole Hidalgo. And then he was asked at trial about who he knew at the apartment, at the victim's apartment, and he said the only people I knew were Nicole Hidalgo and his other cousin, I believe it was Tamika Owens. Edward Lee was also a cousin, and he never mentioned that Edward Lee went with him to the apartment or that Edward Lee was present. So in some ways, the statement from Edward Lee that he was at the apartment and saw the victim there could be considered contradictory to what Petitioner testified at trial. But also, I mean, the other reasons for not putting him on was that he had made at least two prior inconsistent statements. Well, maybe not inconsistent because he didn't say he didn't have the gun. He didn't have a gun, but he did say things like that he tried to rob him and later says he didn't try to rob him. That's right. And he also made inconsistent statements about where he was. I was coming to that later, but the question was if all he knew at the time was that Lee had said he had seen the gun, there would have been no reason not to call him. The only reasons not to call him were unrelated to his statement that he shot a gun. They were the inconsistent statements about what happened in the apartment. And you're adding another one that you now say he didn't believe he was in the apartment. He didn't believe he was at Mr. Jackson's place. Correct. Either outside or inside or anything else. No, no. I thought you said they didn't believe he was in the apartment where the shooting occurred. No, and I'm sorry if I let the court believe that. No, it was that back at the victim's apartment where Mr. Lee supposedly saw the gun in his waistband, there were reasons to doubt that statement because Petitioner had said back at the victim's apartment before the shooting that the only people he knew were his two cousins, his two female cousins. He didn't mention Edward Lee being there. And he never said he went there with Mr. Lee. Didn't Lee give two different versions of where he was in the apartment at the time of the shooting? Later at the time of the shooting, yes, he did give two different versions. He said first he told the police. Or maybe three. What's that? Or maybe three. But go ahead. Yes, we have a statement that he was in the bedroom, and then we have a statement to the police describing the shooting, implying that he saw it. And then later at the deposition, he says he was in the apartment. At the deposition, he didn't know anything about it. That's correct. At that time, he didn't know about it. So it's just to see what the lawyer knew at the time he decided not to call him. I think another important factor, considering what the lawyer knew at the time, was that the lawyer had a detective's report that stated that Mr. Lee had told them that he saw Petitioner try to rob Mr. James Jones after the shooting. He saw a who's report? Sheriff's report, right? Sheriff's report, correct. Not their own investigator. Right. The sheriff's report that indicated that Mr. Lee told the sheriffs that after Petitioner shot the victim in this case, he pointed a gun at James Jones and tried to rob him. Did counsel ever talk to Mr. Lee himself? Counsel did not talk to Mr. Lee himself. He had his investigator, Mr. Little, spoke to him several times and prepared several reports. And Mr. Day testified that he had the statements from Mr. Lee that were prepared by the police and multiple statements that his investigator had obtained. Did his investigator tell him that he thought Mr. Lee was untrustworthy? No. Mr. Little testified at the evidentiary hearing that he thought that Mr. Lee would make a valuable witness. But he admitted that he didn't talk about trial tactics with Mr. Day, trial counsel. And trial counsel testified at the evidentiary hearing, giving various reasons why he believed he would not make a credible witness. Mr. Day certainly represented that he thought these were important witnesses at the time of the trial. He made a statement before trial that he thought Ms. Hidalgo would be an important witness. That is true. But I think if you look at the context of that, he was sort of complaining to the court that he was not able to obtain a witness because he believed that Mr. Jones had threatened her. And while that statement on the record suggests that he believes she was an important witness, I think it's important to realize that there's a difference between a statement made before trial that might be strategic, that might be trying to relay something to the prosecutor, or even to try to buy some sympathy with the court. The district court and the magistrate judge in district court in deciding the prejudice issue didn't factor in any indication that these people wouldn't have showed up if called. They didn't say that's why there was no prejudice. And we're assuming for this purpose that they would have, right? Well, that's correct. I believe the district court, they looked at all the damaging aspects of their testimony. I don't believe that they ---- But they assumed they would have been there. Assuming they would have come, correct. So we're not in any position to, in terms of the prejudice determination, to consider whether or not they would have actually shown up at all. Well, I believe this Court can consider that and can look in the record. And certainly there are many aspects of the record that ---- That would be something you need a fact-finding on, it seems to me. Did anybody ask him that? Oh, I guess they did ask him at the hearing. Didn't they ask him? Did they ask him at the hearing? Did they ask? I'm sorry, Ms. ---- Did they ask Ms. Hidalgo whether she would have come? She ---- I believe she said she would have come if she was given protection from Mr. James Jones. And at one point, she said only if she was at, I don't recall if it was her declaration or another statement to the defense investigator, if she was given, I think, 24 hours of protection. In other words, she was very frightened. So certainly the record does suggest that they may not have come, regardless of what efforts Mr. Dade might have made. And I'd also like to point out, as far as Petitioner's reliance on the case of Riley, I think when examining the prejudice from any ineffective assistance, all the facts of the case need to be looked at. And the fact that in one certain case there might be prejudice from the failure to call a witness doesn't necessarily mean that in another case there would be. And in fact, in Riley, I don't believe there's any evidence that the witness there would have provided damaging testimony in addition to the helpful testimony like we have here. What's more, I'd just like to point out in Riley, there was also a situation where the witness who was not called heard the victim threaten the defendant and threatened to shoot him very close in time to the actual shooting. And I think that's factually different from the situation here, where we don't have a threat, per se, but we have, you know, supposedly seen the victim with a gun in a different location. What's more... Well, he did see him with a gun. I mean, it was all part of the same sequence. It's like saying whether he was wearing a red shirt that day. My understanding is we're talking about minutes or a relatively short period of time. If somebody had a gun in their waistband, you wouldn't expect them, there's no reason to think he would have changed because it was all one sequence. He didn't go anywhere else. If you believe the last story, i.e., that it was from the carport area, and they all, as I understand, went directly to Ms. Hidalgo's apartment from there. It's been kind of underplayed by saying you saw it the same day. You saw it, you know, in the same time sequence where he walked directly to the apartment from there. Well, there's no question. It was close in time. But we don't know what happened with the gun, if it was disposed of, unlike a shirt. But you said somebody was wearing a watch. I saw him wearing the watch, you know, five minutes before he went to the apartment. You would assume, absent some reason to the contrary, that he was still wearing a watch. Well, I would, I think that wearing a watch or wearing an article of clothing is different from having a gun. In your waistband? In a waistband, because someone who has a gun, presumably in a group of hostile people, may make a choice about, okay, I'm not going to go to this location with a gun, I'm not going to go there, I'm going to give it to this other person, I'm going to dispose of the gun. There is probably more thought going into what is going to happen with this gun than changing a shirt or changing a watch. There may be reasons why the victim, the young victim decided not to. I mean, it's better evidence than it was originally represented to be, because it's not just earlier in the day or in some other place. I agree that it was close in time. And I would also point out, by the way, that the prosecution witnesses, after Petitioner testified at trial that he saw the victim with the gun, the prosecution brought back several witnesses on rebuttal and specifically said, Petitioner testified he saw the victim with the gun. Did you see the victim with the gun? All right, but that, you know, the question is, would, of course you've got witnesses for the prosecution, and then you've got the defendant, and so the jury believed the witnesses for the prosecution. The question is, if you had another witness for the defendant, other than the defendant saying, I saw the gun, would that, I mean, if that were all there was, clearly it would be ineffective not to call a witness who corroborates the defendant's story. These are not the sort of most stellar witnesses in general. And so you have some witnesses for the prosecution who say, I didn't see a gun. If you had, you know, a boy who was not a gang member who came in and said, I saw the gun there shortly before, he did have a gun, it might raise a question in the jury's mind. Certainly you would want to have the witness there. Whether it would raise a question in the jury's mind is a different question. That's the one the court decided. They said it wouldn't raise a question in the jury's mind. But the fact, I mean, it would, baffles me about the California Court of Appeals decision is that they said, well, of course you had witnesses who said he didn't have a gun, so therefore testimony wouldn't matter. It might matter if you had the chief of police instead of a 12-year-old boy who said, I saw him five minutes earlier with a gun. That would make a big difference. The jury would have a substantial doubt if you had a reliable witness who came in and said that. Well, I agree, and I believe that it's important to look at the totality of all the circumstances in defining prejudice. Instead of taking one statement by itself, we need to look at everything that would have been introduced had this witness testified. Yes. And various factors that have to be taken into account. Well, that's why I said I had a chief of police that would clearly have raised a substantial doubt. Yes, I agree, and that's why it's important to look at every fact in this case. Some of the crucial facts being that we don't have just an isolated statement about seeing the victim with a gun before the shooting. But in addition to that, would have come in substantial impeachment, some substantial damaging testimony. We also have we don't have the witness saying that he saw the victim with a gun at the time of the shooting, but before the shooting. Whereas the prosecution witnesses all testified that they didn't see the victim with a gun at the time of the shooting. And by the way, I would also point out no gun was found at the crime scene. What's more, in his deposition testimony, Mr. Lee said that he No gun was found at the crime scene. Correct. Okay. Mr. Lee testified at the deposition that, and this goes to the prejudice prong, assuming that the same testimony would have come out of trial. Were all the people who were identified as being at the crime scene still there when the police arrived? I don't believe they identified all the people who were at the crime scene. Mr. Burt was, right? Mr. Burt fled immediately after the shooting. Correct. Well, other than him, were all the people who were around there in the apartment still there when the police arrived? I believe the record shows that there was a large group of people there, and that some of them left and did not stay and speak with the police. So I don't believe they stayed there. So it was possible, at least, that somebody took it from the crime scene. Well, it's true. I believe anything is possible, but on that fact Well, some things wouldn't be possible. If everyone who was only three people were there and they were still there, then the fact that the gun wasn't there would be far more significant. True. I agree. And I would point out on a note related to that, that Mr. Lee said he actually saw the victim right after the shooting, and that Mr. Lee did not see a gun in the victim's hand or a gun on the couch or a gun on the floor. And if he's immediately He did not just say that. That he said all the way through, right? Correct. Yes, he did not see the victim with a gun. He said that at his deposition. He said that at his deposition as well. Correct. So that would have been, again, another piece of testimony that would have been very helpful to the prosecution, balanced against this testimony that supposedly would have been helpful for the defense as well. All right. Thank you, counsel. Thank you. We'll give you about two minutes. What does Mr. Burke say about seeing the gun? There's some testimony that he thought that the victim was rising from the couch. Yes. And he put his hand in his pocket. Did he see? Did he testify that he saw? He saw a black gun. A black gun. A black gun from his waistband. Yes. And that was the desk. That's how he fired. Yes. Did Mr. Burke ever say that he saw the gun before that? No. No. But he did believe that these were gang members and dangerous people. Because that's what his cousin said. Because he never met them before. No. But based upon what he had observed and what he had heard about the people that Nicole Hidalgo was hanging out with and the car that they drove and the expensive rims and the way they were acting and behaving, he felt that they were gang members. And earlier you asked about the deficiency prong. And during Mr. Bates' testimony at the evidentiary hearing at ER 525, he said in answer to this question, so if Edward Lee and Nicole Hidalgo had been living locally at the time of the trial, would you have subpoenaed them? He said yes. So the obstacle here was that he didn't know how to get them to the trial. He was counting on the prosecution. He also testified why he didn't call them, other than the fact that he didn't know how to subpoena them. Right. And he testified that he didn't think they would be helpful to the defense. Well, he also had them on his witness list. He had them ñ he had their names on the witness list. He told the court at the time ñ we have to look at what he was thinking at the time. At the time, he told the court that Hidalgo's testimony was tantamount and centered to his defense. So when the court asks if there's really a remand necessary here, I think that the answer to the question is, if the court applies Reilly in this case and finds that it was prejudicial not to call these witnesses, then by the same token, it was objectively ñ When did he say he would have called them if they'd been here locally? That was the answer to the question, that if he just said yes to the question of if Edward Lee and Nicole Hidalgo had been here. At the evidentiary hearing. I'm sorry? At the evidentiary hearing. At the evidentiary hearing at page 525. That's what he said. He would have subpoenaed them. Of course, he also said that he waited until the conclusion of the State's case in chief when he made the determination not to call them. Right, because the prosecutor ñ he thought the prosecution was going to bring those witnesses to trial. And as a matter of fact, the first thing he told Peter Gold, the appellate lawyer, when he called them up, was that he felt that it was prosecutorial misconduct, that the prosecutors didn't transport the witnesses in and from Hawaii and provide them with protection. Who was it that said that they wouldn't come even if they were subpoenaed? I don't recall. Well, Ms. Hidalgo basically said unless she had protection. Oh, unless she had protection. Right. Right. But as we've discussed before, there was a compulsory process. And she would just ñ just as anybody would be subpoenaed here and refused to come, they would be taken into custody and there would be a body attachment issue. So just ñ Is there a provision for the State to pay for them to come from Hawaii, then? Well, Your Honor, Mr. ñ Mr. Dade actually was requesting funds from the court. He was ñ he was for Mr. Little's services. And he could have made ñ what he would have to have done under this section, under Section 1334, was ñ would be to make a motion with the court and ask the court to bring them. He didn't ñ he made no efforts to get them there. He absolutely made no efforts at all. He ñ I think he was just shocked that the prosecution wasn't going to bring them, but I guess the prosecutor felt that they wouldn't be helpful to their case. He thought that they might be helpful to the prosecution's case and the prosecution would call them. Right. And as he testified, if they had been living locally, he would have subpoenaed them. He also said something about he would put the plane ticket on his credit card and bring them. Right. He said almost everything. He did. He had a lot of reasons, some of them contradictory, and ñ Some of them might have been good if they were the only reasons. Yeah. Yes. Sorry. I don't ñ and that's why I said earlier I don't think it's really necessary to remand because I think the record is pretty clear. He didn't personally interview these witnesses. And even still ñ He said he doesn't interview witnesses. Right. Which is ñ I think under Lord v. Wood is probably pretty bad practice and that less deference should be shown to any of his tactical reasons not to call them as witnesses. But I just want to make clear, you know, Mr. ñ Mr. Burt was 24 years old. He had no prior felony convictions. He really believed that this man, that the victim pulled a gun on him. He was afraid. He shot in self-defense. And he's now doing 40 years to life after having been acquitted on the attempted robbery. So in the balance, Mr. Burt deserves a retrial. He deserves some court to apply Riley v. Payne to this case in an adequate manner. And we would ask that the court do so. Thank you, Kathy. Thank you both very much. The court will take a brief recess.
judges: Reinhardt, Berzon, Miner